STEPTOE, JUDGE:
L. G. DeFelice, Inc., claimant contractor, entered into a contract with respondent for the construction of a section of the West Virginia Turnpike also known as Kanawha County Project No.ID-77-2 (37) 71. The contract was awarded to claimant L. G. DeFelice, Inc. (hereinafter to be referred to as DeFelice) on August 13, 1979, for upgrading a section of the West Virginia Turnpike from the existing two lanes to a four-lane highway. The project involved heavy excavation, the construction of two bridges, and concrete payment. The construction area was mountainous on the north end, involving blasting operations for excavation, while the south end of the project consisted of fill areas. The project had a considerable amount of excess excavation which had to be wasted.
The claim has seven causes of action. The first four causes of action are on behalf of the prime contractor, DeFelice. The fifth cause is on behalf of the subcontractor Atlas Machine and Iron Works, Inc. The sixth cause of action is on behalf of the subcontractor Norther Systems, Inc. The seventh cause of action is on behalf of the subcontractor the Vaughn Building Co., which cause of action was withdrawn and dismissed by the Court at the beginning of the hearing of this claim. The total amount of the claim as brought by DeFelice is in the amount of *103 $539,238.89. The Court has determined that each cause of action shall be considered and decided separately.
FIRST CAUSE OF ACTION
This claim is for interest on the final payment by respondent. Both parties have agreed that the amount of $976.14 is due and owing to DeFelice pursuant to West Virginia Code Chapter 14, Article 3, Section 1. The Court accordingly makes an award to DeFelice in the amount of $976.14.
SECOND CAUSE OF ACTION
This claim is for delay expense incurred by DeFelice due to the alleged interference with and obstruction of its normal construction operations, by respondent’s having ordered a change in claimant’s blasting schedules.
Site preparation involved the blasting and removal of large quantities of rock and surface and sub-surface material in the northern part of the project area, and transporting it to the southern part of the project area, where it was to be used as fill material.
It appears from the evidence that DeFelice devised a blasting sequence involving three shots per working day, with intervals of about three hours between shots. Such an interval was required for removing random rock falling on the existing turnpike, setting up and taking down temporary barricades, loading and removal of the blasted material, and, principally, for moving blasting equipment from one site, after use, to the next site, and setting it up for the next blast, all in difficult terrain. The system was efficient, and no criticism of it appears to have been made by the respondent.
It further appears from the evidence that, on or about the 22nd day of April, 1980, the respondent, apparently at the insistence of the West Virginia Turnpike Commission which felt that traffic on the existing two-lane turnpike was not moving as briskly as it should, ordered DeFelice to conduct blasting only on even hours of the working day; that DeFelice could not prepare for a succeeding blast in a two-hour period, and was forced to blast at four-hour intervals, and consequently lost production; that by October of 1980 the contractor was some 13% behind in its projected blasting and site preparation schedule; consequently it elected, in order to get back on schedule, to continue blasting and hauling operations during the winter months of December, 1980, and January, February and March of 1981, a period during which all construction operations were usually suspended.
DeFelice contends that respondent's unilateral change of its blasting procedures on or about April 22, 1980, caused it, DeFelice, to be delayed in its performance, and that the delay resulted in extra expense to DeFelice in the amount of $86,356.05. The respondent, the Division of Highways, correctly points out that the respondent had a contractual right to take measures to *104 protect traffic on the existing Turnpike and that the order revising the timing of explosions was a lawful exercise of such right for the protection of the Turnpike, and its revenues, and for the convenience of its customers. Be that as it may, the respondent, in exercising its right, made it more expensive for the contractor to perform its duties under the contract.
It is a necessary implication of every contract with promises binding each party that neither will interfere to prevent performance by the other.
17 Am,Jur.2d 899, Contracts §442.
A building contractor may recover damages sustained by him resulting from unreasonable delay on the part of the owner in permitting him to perform his contract.
See Atlantic Coast Line R. Co. v. A. M. Walkup Co., 132 Va. 386, 112 S.E. 663 (1922)
In a contract action where one party has been wronged and has a number of remedies, he may select the most efficient one.'
Cochran v. Ollis Creek Coal Company, 157 W.Va. 931, 206 S.E.2d 410 (1974).
The DeFelice claim consists of:
$51,044.20 for labor,
$ 8,750.48 for equipment expenses,
$10,394.73 for materials used, and,
$7,166.64 for a total of $86,356.05.
The Court finds from a preponderance of the evidence that respondent unreasonably delayed DeFelice in the performance of its duties specified in their contract, and that DeFelice is entitled to recover, in the second cause of action, the sum of $51,044.20, for labor delay, and $8,750.48 for equipment expense delay.
The Court further finds that DeFelice has not proved by a preponderance of the evidence a loss of materials due to the delay caused by the respondent.
The Court disallows that portion of the claim designated as an overhead item, upon the ground that the claim is conjectural and speculative.
See State ex rel. Shatzer v. Freeport Coal Co. et. al., 144 W.Va. 178, 107 S.E.2d 503 (1959).
*105 Accordingly, the Court makes an award to DeFelice, on the second cause of action, in the amount of $59,794.68.
THIRD CAUSE OF ACTION
This claim, by DeFelice against the respondent, the Division of Highways, is for delay expense incurred early in the construction period, due to the alleged failure of the respondent to provide a right-of-way for the use of the contractor in hauling, by truck, blasted rock and other surface and subsurface material, from the northern part of the construction area to the southern portion, for use as fill material.
In the contract between DeFelice and the respondent, the latter was required to provide for necessary access to construction areas and necessary rights-of-way for haulage. There were no roads available except the West Virginia Turnpike, which was used by various vehicles, including ten-wheeler trucks of coal haulers and which the contracting parties apparently assumed could be used by the ten-wheel trucks of the contractor in hauling blasted materials and concrete and aggregates for use in the project. At a pre-construction conference on August 20, 1979, however, representatives of the West Virginia Turnpike Commission appeared and announced that DeFelice would not be permitted to haul blasted rock and other materials, by ten-wheelers, over a bridge crossing Paint Creek near Station 1370, between the loading and dumping areas, and opined that such a use would result in traffic deaths. It appears from the evidence, however, that trucks of the same size, carrying coal, and other trucks of the same size operated by DeFelice in transporting cement and aggregates, were permitted to use the bridge.
In order to obtain a haulage-way, DeFelice negotiated with Eastern Associated Coal Corporation for a right-of-way on the latter's abutting land, and with CS Corporation for a right-of-way across its railroad property, and built a new haulage road, with a new temporary bridge across Paint Creek, near Station 1370. The delay was approximately four months.
The Court finds from the evidence that the construction area, including the area for drilling and blasting, was land-locked; that it was a condition of performance by DeFelice that DeFelice have a right-of-way for its use in hauling rock and other blasted materials from one section of the project to the other; that respondent failed to provide such a right-of-way; that performance by DeFelice was impossible without such a haulage; that DeFelice, on its own initiative and at its own expense, obtained rights-of-way and constructed a haulage road considerable longer than that by the Turnpike, for the sole purpose of transporting blasted materials from the northern section of the construction area to the southern end, as required by the contract; and that DeFelice incurred additional expense as a result of the delay.
A building contractor may recover damages sustained by him for loss resulting from unreasonable delay on the part of the owner in permitting him to perform his contract.

*106
Atlantic Coast Line R. Co. v. A. M. Walkup Co., supra

See also McDonald V. Cole et. al., 46 W. Va. 186, 32 S.E. 1033 (1899).
17 Am.Jur.2d 899, Contracts §422.
The Court finds from the evidence that DeFelice incurred additional expense for which it was not compensated under the contract between the parties as the result of the respondent's having failed to provide DeFelice with a haulage-way for the transportation of blasted material, and that its damages consist of $24,024.80 for labor, $24,372.33 for equipment, $18,081.33 for materials and rights-of-way, and $15,264.60 for constructing the haul road and temporary bridge across Paint Creek, for a total of $81,743.06.
No award is made for home office overhead of DeFelice as the Court considers such element of the claimed damages to be speculative and conjectural.
The Court makes an award to DeFelice, on the third cause of action, in the amount of $81,743.06.
THE FOURTH CAUSE OF ACTION
Over the Memorial Day weekend one night's heavy rain caused extensive damage to a partially constructed segment of the new highway north of the Paint Creek Bridge near Station 1370. The rainfall, for this period from Saturday morning to Tuesday morning, was something between 3.55 inches and 6.0 inches, according to unsatisfactory evidence on the subject.
Since restoration required extra work, for which the contractor was required to give advance notice to the respondent, DeFelice duly notified the respondent by letter dated June 7, 1982, that extra work would be required for which it would seek extra compensation. The restoration was duly completed according to original plans and specifications, and DeFelice seeks compensation for the extra work in the amount of $84,238.00.
On the question of who should bear the risk of damage to work under construction under a building contract, i.e., whether the contractor (in this case DeFelice) or the owner (in this case, the Division of Highways), the general rule is:
One who contracts absolutely or unqualifiedly to erect a structure for a stipulated price, in other words, enters into an entire or indivisible occasioned by the accidental destruction or damage of the building before completion.. .the contractor is not excused from his duty to perform where the partially erected building is injured or destroyed by fire, an act of God, such as lightning, violent or unusual storms, tornadoes or other like disturbances.
13 Am.Jur.2d 67,68, Building and Construction Contractors §64.
Whether a contract is entire or severable is a determination to be made by the Court *107 in this State, in accordance with requirements specified in L.D.A., Inc. v. Cross, 167 W.Va. 215, 279 S.E.2d 409 (1981). After consideration of the evidence in this case, this Court is of the opinion that the contract between DeFelice and the Division of Highways is an entire or indivisible contract for the construction of highway segment, for a set price.
DeFelice maintains, however, that the general rule is inapplicable because the parties, in their contract, have otherwise stipulated as to risk of damage to or destruction of work in progress, citing Standard Specifications Roads and Bridges Adopted 1978, Provision 107.16, which reads as follows:
Until Final written acceptance of the project by the Engineer, the Contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements, or from any other cause, whether arising from the execution or from the nonexecution of the work. The Contractor shall rebuild, repair, restore, and make good all injuries or damages to any portion of the work occasioned by any of the above causes before final acceptance and shall bear the expense thereof except damage to the work due to unforeseeable causes beyond control of and without the fault of or negligence of the Contractor, including but not restricted to acts of God, of the public enemy or governmental authorities.
DeFelice relies upon the exception contained in the above Specifications which relate to acts of God, and contends that it was without fault and that the heavy rain was an act of God.
The contractor, it may be seen from Provision 107.16, supra, must bear the expense of damage to or destruction of work in progress by a heavy rainfall, if such a rainfall was foreseeable.
It appears from the evidence that the rainfall which immediately preceded the damage to work in progress was heavy, but probably not of extraordinary duration or otherwise remarkable; that the construction activity in the immediate vicinity of the damage, with steep slopes, and much rock and disturbed surface, probably prevented normal percolation of the rain; that the work was in progress was in a narrow passage, with inadequate surface and subsurface drains; and that in a relatively short period water accumulated above the construction area, and that the surface water, by force of gravity, and having no other place to go, rushed into the choke area and severely damaged the work in progress. We find that there was a potential for a large amount of damage from precipitation which did not approach being a force majeure or act of God, and which this Court believes to have been reasonably foreseeable.
Our finding of foreseeability is re-enforced by the circumstance that at some time before this washout (the record not reflecting the exact date) less extensive damage to work in progress on the same job was done by surface water following precipitation of less intensity and volume, and that damage was repaired or replaced by DeFelice at its own expense, without making claim for extra work.
*108 The extra work for which this claim is made having resulted from events which, in the attendant circumstances, were reasonably foreseeable, the fourth cause of action is denied.
FIFTH CAUSE OF ACTION
The fifth cause of action is the claim of the steel fabrication subcontractor, Atlas Machine and Iron Works, Inc., hereinafter referred to as Atlas. The steel for the bridges on this project were fabricated from the summer of 1980 through the early spring of 1981 by Atlas at its plant in Gainsville, Virginia. Atlas alleges that respondent's inspectors required work to be done which exceeded the standards imposed by the specifications, and that the extra work caused a delay which impacted all of the operations at the plant. The delay was quantified by Atlas as a total of 6.8 days. The girders for the bridges being fabricated for this project were welded plate girders. These girders necessitated welds for the flanges to the web. The girders were then blast-cleaned to remove mill scale (impurities on the steel). Atlas contends that respondent's inspectors required a "near white metal blast" which exceeded the specifications requiring a "near white metal blast." The procedures followed were to run the girders through a wheelabrator which shot the girders with BB type shot. The girder was then inspected for mill scale and the welds were inspected. Atlas contends that to achieve the "white metal blast" required by the inspector it was necessary to run the girder through the wheelabrator for a second time causing delay for the other girders. Respondent's lead inspector testified that it was Atlas' normal procedure to quickly blast each girder, then have the welds inspected and repaired, if necessary, and then run the girder through the wheelabrator a second time more slowly to achieve a complete cleaning of the mill scale. This was the normal procedure selected and determined by Atlas' personnel.
After the cleaning process, the girder was then ready for the edges to be broken. Atlas claims that respondent’s inspectors required a radius on all edges of the steel being fabricated. To radius an edge requires work by hand which is labor intensive. Respondent contends that edges were normally not required to be radiused, only broken. The Specifications refer to "break the edges" not "radius the edges."
The next stage in the fabrication process required the girders to be spray painted with an organic zinc system of four mils in thickness. Atlas contends that respondent's inspectors required an over sprayed areas to be hand sanded and resprayed with paint to meet the specifications. Respondent contends that over sprayed areas were required to be sanded but not repainted.
Atlas also put forth a claim in the amount of $969.55 for disruption of cash flow when it was not timely paid for work accomplished. The evidence established that invoices for work not approved by respondent's shop inspector were indeed not processed for payment by respondent when presented, but were subsequently approved after having been approved by respondent's shop inspector and presented for payment. Therefore, this portion of the Atlas claim is denied by the Court.
*109 This Court has previously considered many of the issues of Atlas' present claim in an unpublished opinion issued January 18, 1988, S. J. Groves and Sons, Company, for the Benefit of Atlas Machine and Iron Works, Inc. v. Dep't of Highways, Claim Nos. CC-82-295 & CC-83-233. The Court denied the claims based upon over spray and for the radius of edges, but allowed recovery for removal of mill scale from snipes. However, the recovery was limited to work performed prior to May 1, 1980.
In the present claim there was no issue made of the necessity of removal of mill scale from the snipes. The Court is of the opinion to deny the fifth cause of action in its entirety as the problems confronting Atlas in fabricating steel for West Virginia were resolved by May 1, 1980. The steel girders being fabricated for the bridges on this project were not due for delivery until September 1980. Therefore, the Court is of the opinion to and does deny the claim of Atlas.
SIXTH CAUSE OF ACTION
The sixth cause of action was brought on behalf of the subcontractor Northern Systems, Inc., which company was responsible for drilling and grouting the rock anchors for two retaining walls adjacent to the mountain. During construction of the project Northern experienced financial problems. As a result of these problems Northern's bonding company, Indemnity Insurance Company, to be hereinafter referred to as Indemnity, expended certain funds relating to this project. The first issue confronting the Court is the standing of the indemnitor in this claim, i.e., does the bonding company of a subcontractor have the same rights and interests as the subcontractor? The doctrine of collateral estoppel was also raised by respondent as there had been a related lawsuit in Kanawha County Circuit Court wherein Northern was defendant and Indemnity satisfied certain judgments against Northern. Respondent contends that this lawsuit involved the same issue which is the basis of the sixth cause of action, that the issue was resolved by the circuit court action and that, therefore, Indemnity cannot now have the same issue tried again before this Court. The Court must resolve these two issues prior to a consideration of the merits of the claim.
As to the issue of standing, the Court is of the opinion that the surety, Indemnity, has standing in the Court of Claims to present Northern claim just as a casualty insurance company brings actions through its insureds. The Court has determined that collateral estoppel is not a bar to this cause of action inasmuch as the Kanawha County Circuit Court action was brought by Construction Drilling, Inc., to prove and recover damages only. The issue of liability based upon misrepresentations on the part of the respondent herein was not an issue in that action and was not considered by that Court.
Indemnity contends that Northern was unable to perform its contract for DeFelice because the depth of the rock anchors was misrepresented on the plans provided by respondent. Originally, the plans indicated 96 rock anchors but respondent reduced this to 71 rock anchors *110 during construction. Northern was unable to drill certain of the holes as its drilling equipment was inadequate. Construction Drilling, Inc., was brought onto the project by Northern to complete this work. This company was able to perform the drilling necessary as it had the proper drilling equipment. Respondent contends that the plans indicated the depth of the deepest holes accurately and that, therefore, the problems encountered by Northern were directly related to the equipment being used by Northern. The Court agrees with respondent. The Court is of the opinion to deny the sixth cause of action as Indemnity has failed to establish a breach of contract on the part of respondent.
In accordance with the foregoing findings and conclusions, the Court makes awards in the following amounts: first cause of action - $976.14; second cause of action - $59,794.68; third cause of action - $81,743.06, for a total award in the amount of $142,513.88 to claimant L. F. DeFelice, Inc.
Award of $142,513.88.
Judge Baker did not participate in the hearing or decision of this claim.